# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 5, 2008         Decided May 8, 2009

No. 06-5112

MEREDITH LARSON, ET AL.,
APPELLANTS

v.

DEPARTMENT OF STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01937)

*Tania Beth Rose* argued the cause and filed the brief for appellants.

*Joshua P. Waldman*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Leonard Schaitman*, Attorney. *Elizabeth J. Shapiro*, Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, and HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the plaintiffs seek to compel the release of documents pertaining to violence they or their loved ones suffered in Guatemala in the 1970s and 1980s. The National Security Agency ("NSA") and the Central Intelligence Agency ("CIA") withheld, in whole or in part, certain records responsive to the plaintiffs' requests under FOIA Exemptions 1 and 3, and the district court upheld the withholdings in granting summary judgment for the agencies. Despite the plaintiffs' arguments that they are entitled to the documents and that the agencies did not adequately explain why the records should be withheld, we agree with the district court that the withheld documents are exempt from disclosure under FOIA Exemptions 1 and 3, and that the agencies sufficiently detailed the reasons for their nondisclosure. The plaintiffs also challenge the responsiveness of the Department of State ("DOS") to one of their FOIA requests and the district court's decision not to view the withheld documents *in camera*. We affirm the judgment of the district court on these issues as well.

I

The plaintiffs in this case each independently sought information about past violence in Guatemala from government agencies pursuant to FOIA. "FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exemptions." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation omitted). Exemption 1 protects matters "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption 3 covers matters "specifically exempted from disclosure by statute," provided that such statute leaves no discretion on disclosure or "establishes particular criteria for withholding or refers to

particular types of matters to be withheld." *Id.* § 552(b)(3). These exemptions cover not only the content of protected government records but also the fact of their existence or nonexistence, if that fact itself properly falls within the exemption. *Wolf*, 473 F.3d at 374. Agency refusal to confirm or deny the existence of records responsive to a request is known as a *Glomar* response. *Id.* (citing *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976), which concerned the existence of records regarding a ship named *Hughes Glomar Explorer*).

As relevant here, plaintiff Meredith Larson submitted a FOIA request to the NSA, seeking documents relating to a violent attack she suffered in Guatemala in 1989, the organization she worked with in Guatemala, and her subsequent visits to the country and meetings with Guatemalan and United States government officials. In response to Larson's request, the NSA released to her four documents in full and eight documents in part, making redactions pursuant to FOIA Exemptions 1 and 3.

Plaintiff Thomas Henehan, a Maryknoll priest, made a FOIA request of NSA regarding a 1976 plane crash that killed a fellow Maryknoll priest working as a missionary in Guatemala. Henehan requested all documents relating to the crash and the priest's death, including records about threats to and investigations of the Maryknoll Fathers, copies of the original 1995 FOIA file created in response to another priest's request, and information about Guatemalan troop movement in the Ixcan region at the time of the crash. The NSA released thirty-six documents to Henehan—six in full and thirty in part[1]—and advised him that, pursuant to FOIA Exemptions 1

---

[1] The NSA redacted e-mail routing information from some of these documents pursuant to FOIA Exemption 2, which covers matters

and 3, it was withholding 137 responsive documents that pertained only to Guatemalan troop movement and not to the priest.

Plaintiff Patricia Kerndt also requested documents from the NSA regarding the 1976 plane crash and the death of her sister, who was a passenger on board the plane. The NSA found one responsive document, which it withheld in full under FOIA Exemptions 1 and 3. The NSA informed Kerndt that although the document indicated that a plane crashed on the date in question, it did not contain any information about the passengers, the cause of the crash, who may have been responsible, or any government actions.

Plaintiff Adriana Portillo-Bartow submitted FOIA requests to the NSA and the CIA, seeking documents relating to the 1981 abduction and disappearance of her family in Guatemala. The CIA found four responsive documents, none of which mentioned members of Portillo-Bartow's family, and withheld them under Exemptions 1 and 3. The NSA issued a *Glomar* response to Portillo-Bartow's request, stating that it could not confirm or deny the existence of responsive records pursuant to FOIA Exemptions 1 and 3.

Plaintiff Lisel Holdenried made a FOIA request of the DOS for all documents concerning the 1983 murder of her father in Guatemala. Her request, made in 2002, also stated: "Please be aware that Ms. Holdenried made a request for documents in 1995, and received some documentation. However, some documentation was not submitted to her. Please regard this as a renewed request." The DOS had decided Holdenried's appeal

"related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The plaintiffs do not challenge these redactions on appeal.

of its response to the 1995 request in 1998. In response to her 2002 request, the DOS found thirty-six responsive documents and released them all to Holdenried in full. The DOS advised Holdenried that it had released some of those thirty-six documents to her in response to her 1995 FOIA request, and that the information she sought was now publicly available on the DOS website.

In an effort to obtain the withheld and redacted documents from the defendant agencies, the plaintiffs filed this suit in the district court. The agencies moved for summary judgment and along with their motions filed affidavits regarding their responses to the FOIA requests, including *Vaughn* indices describing the withheld documents and explaining why the withheld information fell under the claimed exemptions. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). The district court declined the NSA's offer to provide a supplemental classified declaration *ex parte in camera* regarding the agency's *Glomar* response to Portillo-Bartow because there was no evidence of agency bad faith and the agency's affidavit was sufficiently detailed to permit meaningful review of the claim of exemption. After reviewing the affidavits and all the parties' motions and materials, the district court granted summary judgment for the NSA and the CIA on the claims currently before us, concluding that FOIA Exemptions 1 and 3 protected the withheld material from disclosure. The court also granted summary judgment for the DOS on Holdenried's claim, concluding that the DOS conducted a reasonable search given the search parameters Holdenried provided. The plaintiffs now appeal.

II

An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the

applicability of the claimed exemption by affidavit, and we review the agency's justifications therein *de novo*. *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926 (D.C. Cir. 2003); 5 U.S.C. § 552(a)(4)(B). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (quotation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf*, 473 F.3d at 374-75 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982), and *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir. 1979)).

FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other. *Gardels*, 689 F.2d at 1106-07. Although Exemption 1 or 3 alone would likely be sufficient to uphold the agencies' withholdings in this case, we affirm the district court's judgment that both exemptions apply to the documents in question.

A

The CIA withheld from Portillo-Bartow four intelligence cables that report detailed descriptions of information obtained from a particular CIA source and provide general information about the source. Regarding each cable the CIA explained that "[o]nly certain people would have been in a position to know the information contained in the cable. This information, when combined with the time period and information outside the cable, could provide enough clues to allow some individuals to

determine who provided the information to the CIA. In other words, it could disclose the identity of the CIA source." McNair Decl. Ex. 1 at 6-7. The CIA concluded that no meaningful information could be segregated from the cables for release.

1

The CIA claims that the cables are exempt from disclosure under FOIA Exemption 1 because they are currently properly classified pursuant to Executive Order 12958 as information concerning "intelligence sources or methods," and their disclosure could reasonably be expected to damage national security. Exec. Order No. 12958 § 1.5(c) (1995), *as amended by* Exec. Order No. 13292 § 1.4(c), 68 Fed. Reg. 15,315, 15,317 (March 25, 2003). In its affidavit, the CIA explains that information that could lead to discovery of an intelligence source must be protected to preserve that source (or if the source is no longer alive, other sources discovered through that individual) and to preserve the government's ability to retain other current sources and recruit new sources. Disclosure of an individual's cooperation with the CIA in contravention of previous assurances of confidentiality would seriously undermine the CIA's ability to retain its current intelligence sources and attract future intelligence sources. The CIA also explained that disclosing the cables could lead to the unauthorized disclosure of intelligence methods, the means by which the agency accomplishes its intelligence-gathering mission. These methods are valuable for intelligence gathering only so long as those who would use countermeasures against them remain unsuspecting. Even seemingly trivial details may be of great significance to foreign intelligence services with a broad view of the intelligence landscape in their attempts to discover and thwart CIA intelligence-gathering methods. Once an intelligence method is disclosed, its continued use is compromised and the CIA must attempt to develop and validate

new intelligence methods at significant monetary and informational costs.

The CIA has carried its burden to show that FOIA Exemption 1 applies to the four cables withheld from Portillo-Bartow. In its affidavit the agency described with reasonably specific detail the reason for nondisclosure: the importance for continuing intelligence operations of keeping intelligence sources and methods classified and confidential. The Supreme Court has acknowledged the paramount importance of protecting intelligence sources for precisely the reasons detailed by the CIA:

> If potentially valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place. . . . "The continued availability of [intelligence] sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger their personal safety."

*CIA v. Sims*, 471 U.S. 159, 175-76 (1985) (quoting *Snepp v. United States*, 444 U.S. 507, 512 (1980)). The agency's affidavit also demonstrates that the withheld cables logically fall within the exemption, that is, that they are properly classified in the interest of national security. *See* 5 U.S.C. § 552(b)(1). We "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [*sic*] might occur as a result of a particular classified record." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 (quoting *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983)).

Granting the CIA's affidavit substantial weight concerning the classified nature of the cables due to the risk that their release could pose to national security, the affidavit sufficiently demonstrates, to the extent possible without revealing classified information, that the cables are properly classified under Executive Order 12958 in the interest of national security, and therefore fall within Exemption 1. The parties present us with no evidence to the contrary or evidence suggesting bad faith on the part of the CIA in withholding the cables.

Portillo-Bartow would demand further explanation from the CIA about how release of the information in the cables "could actually contribute to the potential loss of national security." She argues that the district court should have required the CIA to answer follow-up questions to its affidavit such as whether the passage of time or change in political environment have rendered classification less necessary, and how revelation of specific details she requested such as the source's nationality and whether the source is still alive bear on national security.

Although conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden, *see Hayden*, 608 F.2d at 1387, such affidavits are not at issue here. The CIA sufficiently detailed the classified information in the withheld cables, why that information was classified, and why it logically must remain classified in the interest of national security. As the district court noted, identification of the source is the only purpose served by the details Portillo-Bartow seeks about the source, and identification is the very danger against which the Executive Order protects. Minor details of intelligence information may reveal more information than their apparent insignificance suggests because, "'much like a piece of jigsaw puzzle, [each detail] may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself.'

. . . The CIA has the right to assume that foreign intelligence agencies are zealous ferrets." *Gardels*, 689 F.2d at 1106 (quoting *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980)). In its affidavit, the CIA also explained why the passage of time—"whether three or thirty years"—did not alter the need to assure sources of the government's ability to maintain confidentiality, and we have credited the logic of that explanation. *See Wolf*, 473 F.3d at 377 ("[I]t is logical to conclude that the need to assure confidentiality to a foreign source includes neither confirming nor denying the existence of records even decades after the death of the foreign national."); *Fitzgibbon v. CIA*, 911 F.2d 755, 763-64 (D.C. Cir. 1990) ("[T]he Government has a compelling interest in protecting both the secrecy of information important to our national security and *the appearance of confidentiality* so essential to the effective operation of our foreign intelligence service." (quoting *Sims*, 471 U.S. at 175)).

If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise, as is the case here, the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions. *See Gardels*, 689 F.2d at 1104; *Halperin*, 629 F.2d at 148. "[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927. Today we reaffirm our deferential posture in FOIA cases regarding the "uniquely executive purview" of national security. *Id.* at 926-27. The judiciary "is in an extremely poor position to second-guess" the predictive judgments made by the government's intelligence agencies regarding questions such as whether a country's

changed political climate has yet neutralized the risk of harm to national security posed by disclosing particular intelligence sources. *Id.* at 928; *see Halperin*, 629 F.2d at 148; *Hayden*, 608 F.2d at 1388. We therefore reject Portillo-Bartow's encouragement to cross-examine the CIA until we are satisfied that its assessment of the national security risk is correct.

2

Portillo-Bartow's objections are similarly unavailing against the CIA's invocation of FOIA Exemption 3. Under that exemption, the CIA need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute. *Fitzgibbon*, 911 F.2d at 761-62. Here, the CIA invoked the National Security Act, which requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure."[2] 50 U.S.C. § 403-1(i)(1) (formerly 50 U.S.C. § 403-3(c)(7)). Portillo-Bartow does not dispute that section 403-1(i)(1) is an exemption statute. *See Fitzgibbon*, 911 F.2d at 761 ("There is thus no doubt that section 403(d)(3) [now section 403-1(i)(1)] is a proper exemption statute under exemption 3."). In section 403-1(i)(1), "Congress gave the Agency broad power to control the disclosure of intelligence sources." *Sims*, 471 U.S. at 173. Thus, our only remaining inquiry is whether the withheld material relates to intelligence sources and methods. *Fitzgibbon*, 911 F.2d at 762. As previously discussed, according substantial weight to the CIA's

---

[2] The CIA also invoked the Central Intelligence Agency Act, which exempts the CIA from any laws that require disclosure of the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g. Portillo-Bartow does not contest the applicability of this exemption to withhold internal CIA organizational data in the cables.

affidavits, we easily conclude that it does, and Portillo-Bartow's objections do not alter our conclusion.

B

The NSA also withheld responsive documents or parts of documents from the plaintiffs pursuant to FOIA Exemptions 1 and 3. As relevant here, the NSA withheld from Kerndt one foreign intelligence report that indicated a plane crashed on the date about which she inquired but did not contain any additional pertinent information. The NSA redacted parts of eight documents it released to Larson; at her request, throughout the documents the agency noted the specific exemption applicable to each redaction. As to Henehan's request, the agency redacted parts of thirty documents, indicating the exemption claimed by each redaction, and withheld in their entirety 137 foreign intelligence reports relating solely to Guatemalan troop movement. The agency explained that no portion of those reports was reasonably segregable and a particularized index of the reports would compromise the secret nature of the information. Finally, the NSA informed Portillo-Bartow that it could neither confirm nor deny the existence of materials responsive to her request for documents relating to the abduction of her family and potential safe houses in Guatemala because the existence or nonexistence of materials responsive to that request was properly classified and protected by statute.

1

The NSA asserts that the documents and redactions withheld from Portillo-Bartow, Larson, Kerndt, and Henehan are exempt from disclosure under FOIA Exemption 1 because they are currently properly classified pursuant to Executive Order 12958 as concerning "foreign government information"; "intelligence activities . . . , intelligence sources or methods, or

cryptology"; "foreign relations or foreign activities of the United States, including confidential sources"; and "vulnerability or capabilities of systems, . . . projects, [and] plans . . . relating to the national security." Exec. Order No. 12958 § 1.5(b), (c), (d), (g) (1995), *as amended by* Exec. Order No. 13292 § 1.4(b), (c), (d), (g), 68 Fed. Reg. at 15,317.

In its affidavit, the NSA explained that one of its central missions is "to intercept communications of foreign governments in order to obtain foreign intelligence information necessary to the national defense, national security, or the conduct of the foreign affairs of the United States." Giles Aff. at 2. The identity of specific communications (referred to as "targets"), the degree of success in exploiting those targets, the vulnerability of particular foreign communications, and the extent of any cryptological successes must be kept in strict secrecy because of the fragility of the NSA's ability to exploit foreign communications. Disclosure of such information would provoke protective countermeasures by the targets of the NSA's efforts, and if a foreign power successfully defeats an interception operation, the government loses all intelligence from that source unless and until the NSA can develop new equivalent exploitation of the foreign power's signals. In the meantime, "the military, national policymakers and [the] intelligence community must operate without the information the signals provided. Such losses are extremely harmful to the national security of the United States." Giles Aff. at 3.

The NSA explained that the information withheld from Larson, Kerndt, and Henehan "is derived from the most sensitive and fragile" signals intelligence targets and identifies targets whose communications the NSA has exploited or pertains to intelligence collection assignments and the technical details of collection. Giles Aff. at 10. Disclosure of that information would inform those targets of their vulnerabilities

and the NSA's specific capabilities, sources, and methods, prompting the targets to undertake countermeasures to deny access to those communications. The NSA concluded that the loss of these highly prized communications could reasonably be expected to cause serious damage to national security and foreign relations interests. The agency similarly determined that confirming the existence or nonexistence of records responsive to Portillo-Bartow's request would reveal vulnerabilities of communications systems, the success or lack of success in collecting information, and projects or plans relating to national security. Requiring acknowledgment of whether or not responsive records exist, the NSA explained, could reasonably be expected to cause serious damage to the national security.

The NSA has carried its burden to show that FOIA Exemption 1 applies to the documents and information withheld from these plaintiffs. The agency described with reasonably specific detail the reason for nondisclosure: the necessity to foreign intelligence gathering of keeping targets and foreign communications vulnerabilities secret. We have credited this reason for nondisclosure. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 840 (D.C. Cir. 2001) (explaining that disclosure of targets' vulnerabilities would cause targets "to engage countermeasures to deny access to those communications"). We have also accepted this level of detail in an NSA explanation as sufficiently specific to qualify for withholding under Exemption 1 in light of the substantial weight owed agency explanations in the context of national security. *See id.* (accepting explanation that the information at issue identifies exploited targets and to disclose any related information "would inform those targets of their vulnerabilities and of NSA's specific capabilities, sources and methods"); *cf. Founding Church of Scientology v. NSA*, 610 F.2d 824, 831 (D.C. Cir. 1979) (holding insufficiently specific explanation that "fail[ed] to indicate even in the slightest *how* agency functions

might be unveiled" and "lack[ed] so much as guarded specificity as to the 'certain functions and activities' that might be revealed" (quoting agency affidavit)). Indeed, we have recognized that in some circumstances even itemizing the information withheld could compromise secrecy in the NSA signals intelligence context, because "the sensitive material comprises more than just the substantive content of the messages. Harm could follow from the disclosure of any material that might help to identify the communications intercepted by NSA, such as information about date, time, origin, or manner of transmission or receipt." *Hayden*, 608 F.2d at 1385 (emphasis omitted).

In its affidavit the NSA also demonstrates that the withheld information is properly classified under Executive Order 12958 in the interest of national security and thus logically falls within Exemption 1. *See Miller*, 730 F.2d at 776; *see also Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 (courts accord "substantial weight to an agency's affidavit concerning . . . classified status" (quotation omitted)). The affidavit is not controverted by any contrary evidence in the record or any evidence suggesting agency bad faith.

As they would with the CIA, the plaintiffs here would have the district court demand additional detail from the NSA, such as whether the passage of time and "presumabl[e] outdat[ing of] technology" bears on the need for continued secrecy, whether a manner of disclosing information exists that would not reveal details about signals intelligence targets, and why the "targets have to be identified instead of the information being identified." Putting aside the fact that the NSA's affidavit is sufficient to answer these queries, the plaintiffs' proposed further judicial inquiry is not required by—indeed is even contrary to—our precedent. "Once satisfied that proper procedures have been followed and that the information

logically falls into the exemption claimed, the courts need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith." *Gardels*, 689 F.2d at 1104 (quotation omitted). Not only have we counseled that courts need not go further, we have held that "the court *is not to* conduct a detailed inquiry" if the agency's statements meet the preliminary standard, as the NSA's affidavit here does. *Halperin*, 629 F.2d at 148 (emphasis added).

Finally, at oral argument counsel for the plaintiffs complained that the agencies often use the same or similar language in different affidavits supporting FOIA exemptions. Plaintiffs suggested that this similarity reveals that the agencies do not faithfully consider FOIA requests but rather issue boilerplate responses, which should spur the court to require more explanation. However, when the potential harm to national security in different cases is the same, it makes sense that the agency's stated reasons for nondisclosure will be the same. We are therefore not disquieted by the NSA's similar responses in similar cases. Certainly, an agency's response must logically fit the particular facts and circumstances of the case—a response so vague that it suits every case would fail for any number of reasons, *see Hayden*, 608 F.2d at 1387—but the fact that similar exemption explanations regarding signals intelligence targets suit similar cases about revealing such targets is not a cause for further judicial inquiry.

2

Having overcome the plaintiffs' objections to application of Exemption 1, the NSA easily demonstrates that Exemption 3 also protects the withheld material from disclosure. As explained above, under Exemption 3 the NSA need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the

statute.  *See Fitzgibbon*, 911 F.2d at 761-62.  The NSA invoked three statutes to support its withholdings:  First, the agency invoked section 6 of the National Security Act, which is a statutory privilege unique to the NSA and provides that "nothing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof."  50 U.S.C. § 402 note.  Section 6 qualifies as an Exemption 3 statute, *Hayden*, 608 F.2d at 1389, and provides absolute protection, *Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996).  The NSA is not required to show harm to national security under section 6, but need only demonstrate that the withheld information relates to the organization of the NSA or any function or activities of the agency.  *See Hayden*, 608 F.2d at 1390.  Second, the agency invoked section 798(a)(3)-(4) of the federal criminal code, which prohibits the unauthorized disclosure of classified information "concerning the communication intelligence activities of the United States" or "obtained by the process of communication intelligence from the communications of any foreign government."  18 U.S.C. § 798(a)(3)-(4).  The plaintiffs do not dispute that section 798 qualifies as an Exemption 3 statute.  *See, e.g.*, *N.Y. Times Co. v. Dep't of Def.*, 499 F. Supp. 2d 501, 512-13 (S.D.N.Y. 2007) (applying 18 U.S.C. § 798 as an Exemption 3 statute); *Winter v. NSA*, 569 F. Supp. 545, 548 (S.D. Cal. 1983) (same).  Third, the agency invoked 50 U.S.C. § 403-1(i), which as explained above, instructs the Director of National Intelligence to protect intelligence sources and methods from unauthorized disclosure, regardless of classification, and qualifies as an Exemption 3 statute.  *See supra* Part II.A.2.

As is evident from our discussion regarding Exemption 1, in its affidavit the NSA demonstrated that disclosure of the withheld materials would reveal "information with respect to the activities" of the NSA, 50 U.S.C. § 402 note; classified

information "concerning the communication intelligence activities of the United States" or "obtained by the process of communication intelligence from the communications of any foreign government," 18 U.S.C. § 798(a)(3)-(4); and information relating to "intelligence sources and methods," 50 U.S.C. § 403-1(i)(1). The plaintiffs' challenge to the NSA's reliance on Exemption 3 fails.

III

We must also review *de novo* the grant of summary judgment in favor of the DOS regarding its response to Holdenried's FOIA request, although this inquiry need not detain us long. In her FOIA request to the DOS, Holdenried specified that she sought any information about her father and his death in Guatemala, including a list of ten related topics. Later in the letter she stated, "Please be aware that Ms. Holdenried made a request for documents in 1995, and received some documentation. However, some documentation was not submitted to her. Please regard this as a renewed request." The DOS found thirty-six responsive documents and released them all to Holdenried in full. Holdenried now argues that her request also entitled her to DOS documents concerning the agency's response, both initial and appellate, to her 1995 FOIA request, or to district court review of the agency's 1998 appellate decision to withhold certain documents responsive to the 1995 request.

In determining whether an agency has discharged its FOIA responsibilities, the issue we must resolve is whether the search for documents was adequate, "and adequacy is measured by the reasonableness of the effort in light of the specific request." *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). "The burden of adequately identifying the record requested lies with the requester." 22 C.F.R. § 171.5(c). Holdenried's FOIA

request gave no indication that she sought DOS documents regarding the agency's previous responses to her 1995 FOIA request.  At best, Holdenried's 2002 request suggested that she had sought similar documents in 1995 without complete success and now sought the same documents again, without identifying the parameters of her 1995 request or the documents previously withheld or received.  Such a request does not reasonably suggest to the DOS that it should search for and disclose internal documents arising out of the agency's decisions concerning her 1995 request.

Nor was Holdenried entitled to judicial review of the DOS response to her 1995 FOIA request on this record.  Nowhere in her complaint did Holdenried mention the 1995 request or in any way suggest that she sought judicial review of the DOS response to her 1995 request as opposed to her 2002 request, which was the subject of the complaint.  The district court therefore quite properly concluded that "[a]ction on her [1995] request came to an end when her appeal of that case was decided [by the DOS] in 1998." *Larson v. Dep't of State*, No. 1:02cv01937, 2005 WL 3276303, at \*25 (D.D.C. Aug. 10, 2005).

IV

Finally, we review for abuse of discretion the district court's decision not to conduct *in camera* review of the withheld documents or the NSA's proffered supplemental classified declaration.  *See Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008).  The plaintiffs argue that the court should have undertaken *in camera* review of the withheld documents because review can result in greater disclosure and courts should independently verify the government's claims of protection.

FOIA provides district courts the option to conduct *in camera* review, 5 U.S.C. § 552(a)(4)(B), but "it by no means

compels the exercise of that option," *Juarez*, 518 F.3d at 60. *In camera* review is available to the district court if the court believes it is needed "to make a responsible de novo determination on the claims of exception." *Id.* (quoting *Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987)). If the agency's affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Hayden*, 608 F.2d at 1387; *see also Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977). Although district courts possess broad discretion regarding whether to conduct *in camera* review, *Carter*, 830 F.2d at 392, we have made clear that "[w]hen the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate," *Hayden*, 608 F.2d at 1387. *In camera* inspection is "particularly a last resort in 'national security' situations" like this case, *Weissman*, 565 F.2d at 697—"a court should not resort to it routinely on the theory that 'it can't hurt,'" *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).

The district court here did not abuse its discretion in declining to view the withheld documents or the proffered supplemental classified declaration *in camera*. The court concluded, and we agree, that the agencies' affidavits standing alone were sufficiently specific to place the challenged documents within the exemption categories, and the plaintiffs did not contest the contents of the withholdings or present any evidence contradicting the affidavits or suggesting bad faith. Summary judgment without *in camera* review was therefore appropriate and not an abuse of the district court's broad discretion.

V

We affirm summary judgment for the defendant agencies, agreeing with the district court that the DOS responded appropriately to Holdenried's request, that the affidavits of the NSA and the CIA were sufficient to support their reliance on FOIA Exemptions 1 and 3, and that *in camera* review was not necessary to reach this decision. The withheld materials at issue in this case are precisely the sort of documents and information intended to be protected from public disclosure by Exemptions 1 and 3. We deny the plaintiffs' request for judicial notice of articles relating to Guatemala and government secrecy because those articles are irrelevant to our inquiry; taking notice of them would not affect our opinion.

*So ordered.*